CLERK'S OFFICE U.S. DIST. COURT
AT DANVILLE, VA
FILED

JAN 2 8 2021

JULIA C. DUDLEY, CLERK
BY: _____
DEPUTY CLERK

## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF VIRGINIA--- DANVILLE

| | |
|---|---|
| Jerry O'Neil, and §<br>Jessica Lynne Reavis, §<br>  Plaintiffs, §<br> §<br>v. §<br> §<br>Angela Reece Harris; §<br>Administrative Judicial Assistant §<br>to the Honorable Stacey W. Moreau §<br>Pittsylvania County Circuit Court §<br>Post Office Box 1042 §<br>Chatham, Virginia 24531 §<br>Paul Gammon; §<br>Sharon Gammon; §<br>DIESEL ENGINE & §<br>EQUIPMENT REPAIR; §<br>P.O. Box 26 §<br>175 Macken Lane §<br>Blairs, Virginia 24527 §<br>  and §<br>John Does 1-20, §<br>  Defendants. § | CIVIL ACTION NUMBER:<br><br>4:21CV00006<br><br><br><br>Trial-by-Jury Demanded |

§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§

## COMPLAINT FOR DAMAGES, INJUNCTION &
## DECLARATORY JUDGMENT

1.    Plaintiffs O'Neil, and Reavis file this suit alleging infringement of their constitutional rights contrary to law by a Virginia Administrative Judicial Assistant (Clerk of Court) during the course of a judicial proceeding in Pittsylvania County, 22nd Circuit Court, namely CL20-1580 "Reavis v. Diesel Engine & Equip."

*Jerry O'Neil & Jessica Lynne Reavis, v. Angela Reece Harris,*
*Paul & Sharon Gammon, Diesel Engine & Equipment Repair, et al.*                    Page 1

2.     Plaintiff Jerry O'Neil is a retired State Senator, resident of Columbia Falls, Montana, who agreed to serve as Jessica Lynne Reavis' Secretariat, general and special agent.

3.     Plaintiff Jessica Lynne Reavis is a self-employed individual, non-corporate, business operator, who drives an 18-wheel commercial truck in interstate commerce with an "essential services" certification from the United States Department of Homeland Security.

4.     Plaintiff Jessica Lynne Reavis has been driving commercial trucks for the past 18 years.  Reavis is a sole proprietor, working personally and only for herself as an independent contractor, not set up as a corporate entity but only as an individual, personal dba, who pays both her Federal and Virginia State incomes taxes in her own name: Jessica Lynne Reavis.

5.     Plaintiff Reavis is a consumer and not a business for purposes of the Virginia Consumer Protection Act, indistinguishable in her need for vehicle maintenance from any other individual, personal, independent contractor.

6.     This Court properly exercises jurisdiction pursuant to 28 U.S.C. §§1331 and 1343, as well as 42 U.S.C. §§1983 & 1988(a).

7.     Venue properly lies in the Western District of Virginia, Danville Division, under 28 U.S.C. §§1391(b)(1) and (b)(2).

*Jerry O'Neil & Jessica Lynne Reavis, v. Angela Reece Harris,*
*Paul & Sharon Gammon, Diesel Engine & Equipment Repair, et al.*                          Page 2

8.      State Actor Defendant Angela Reece Harris is an assistant or deputy clerk to the Honorable Judge Stacey Moreau of the 22nd Circuit Court in and for Pittsylvania County, One North Main Street, Chatham, Virginia 24531.

9.      Commercial Defendants herein are DIESEL ENGINE & EQUIPMENT REPAIR (hereinafter DE&E), its officers and owner-operators Paul and Sharon Gammon, and its employees and independent contractors John Does 1-20, whose full names and titles are unknown at the present time.

10.     Paul and Sharon Gammon own and operate DE&E, which advertises itself on the world wide web as a major service center in Blairs, Virginia, specializing in the maintenance of commercial trucks. See especially its Facebook page: https://www.facebook.com/Diesel-Engine-Equipment-Repair-Inc-624833250900390/timeline (verified Sunday 24 Jan., 2021).

11.     DE&E Repair is a Virginia corporation whose registered agent for service of process is:

> ROBERT T. VAUGHAN, JR
> 772 MAIN ST
> DANVILLE, VIRGINIA 24541

## UNIQUE FACTS GIVING RISE TO FEDERAL JURISDICTION

## Count I: State Action: Impairment of Obligations of Contract

12.     On Wednesday, 25 November 2020, Angela Reece Harris wrote an e-mail to Jerry O'Neil, copied to Jessica Lynne Reavis and others, stating:

> Mr. O'Neil - I respect that Ms. Reavis has requested this of
> you and that she is not able to receive her correspondences
> on a frequent basis but since you are not named in the suit
> nor are you counsel of record - I will not be able to
> communicate to you for Ms. Reavis.
> Thank you.

13.    Defendant Angela Reece Harris effectively prevented Plaintiff Jessica

Lynne Reavis from presenting her case by impairing Jessica Reavis' right to

contract for general or specific agency. (See email attached as Exhibit A).

14.    Angela Reece Harris cited no statutory or court promulgated rule,

order, or law but simply refused to afford Ms. Reavis' contract for, or

relationship of agency, with Jerry O'Neil the same enforceable respect as

Angela Reece Harris had given to Attorney Clint Verity's (HCCW) paralegal

Kelly Allen in an earlier e-mail sent Tue., Nov 17, 2020 09:56. [See email

attached as Exhibit B, including Kelley Allen's letter of January 8, 2021].

15.    On January 8, 2021, Paralegal Kelley Allen wrote again to Angela Reece

Harris, copied only to Plaintiff Jessica Lynne Reavis.

16.    On January 9, 2021, Plaintiff O'Neil's assistant/clerk wrote to Angela

Reece Harris on behalf of both plaintiffs in this cause:

> Ms. Angela Reece Harris:
> I am writing on behalf Senator Jerry O'Neil who is
> corresponding agent and Secretariat to Plaintiff Jessica
> Lynne Reavis.
> Ms. Reavis is back on the road and will not be available
> for     six     weeks,     until     mid-to-late     February.

Diesel Engine & Equipment Repair cost Ms. Reavis nine months of delay in her work, even before the COVID-19 Pandemic broke out.

Disturbingly, and somewhat offensively, we have here another letter to you from Kelly Allen who is an employee of Clint Verity (and someone we have not heard of before named "Patrick O'Grady") who all appear to represent Diesel Engine & Equipment Repair.

Kelly Allen is an employee of a representative of a corporation.

In other words, Kelly Allen is to Clint Verity as I am to Senator O'Neil: i.e., she is a letter writer.

You obviously accept letters from Kelly Allen, who refers to you as "Angie," suggesting some familiarity, perhaps even friendship, but clearly regular and routine communication.

You do not tell her that you will only accept letters from attorneys or parties, and Senator O'Neil and Ms. Reavis agree that it would be absurd for you to do so.

You refused to accept letters from Senator Jerry O'Neil as Secretariat (with Private Power of Attorney) to Ms. Reavis, even after Ms. Reavis wrote to you on November 11, 2020, (see attached) indicating her extreme scheduling problems due to her interstate work under the supervision of the DHS, and designating Senator Jerry O'Neil as her agent with power of attorney (see his November 19, 2020, letter attached, also attached here).

Senator O'Neil and Ms. Reavis are very concerned about the due process implications and judicial ethics of the fact that you, as a government official, will allow Kelly Allen to write to you as a paralegal but not him.

Senator O'Neil and Ms. Reavis ask that you schedule no matter in this case without Senator O'Neil's consent as Ms. Reavis' Agent.

At this point, please provide Senator O'Neil and Ms. Reavis with all documents, including but not limited to court orders, laws or court rules, upon which you intend to rely in defense of your refusal to communicate directly with a pro se litigant's authorized agent and representative, while freely communicating with Kelly Allen who is also an employee of a representative, in exactly the same position as I am.

17.    Then, on Wednesday, January 13, 2021, in response to Plaintiff O'Neil's clerk's message to Angela Reece Harris, Harris wrote to Jessica Lynne Reavis and Clint Verity (this time omitting or bypassing Kelly Allen):

> Mr. Verity - I have been instructed by the Court to only communicate with attorneys of record and the *pro se* plaintiff.

18.    As a state agent, employee or officer, Angela Reece Harris is a state actor acting under color of law, with special privileges and immunities expressly stated under §15.2-1606 VA ST, to violate or infringe upon Jessica Lynne Reavis' equal right of access to the Courts and ability to make procedural motions and present evidence.

19.    The court-enforced instructions, to which Angela Reece Harris referred to above, substantially impair Plaintiffs in the exercise of their rights and obligations of contract, in violation of Article I, §10, Clause 1 of the Constitution of the United States of America, without any important, significant or legitimate purpose behind the regulation, which is neither reasonable nor appropriate and lacks any public purpose (See Exhibit B).

20.    The Code of Virginia §15.2-1606 provides for the defense of "constitutional officers" including "any deputy or assistant of any such officers" when "made defendant in any civil action arising out of the performance of his [sic] official duties", and provides a special political

benefit to Angela Reece Harris which benefit appears to constitute a special privilege or immunity denying equal protection of law, in violation of the Fourteenth Amendment, as well as the clauses of nobility provisions of both Article I, §§9-10 and Article I, §4 of the U.S. and Virginia Constitutions.

21.    Angela Reece Harris should not be afforded any such defense at taxpayer expense because she has needlessly complicated and increased the expense of litigation and willfully and intentionally denied Jessica Lynne Reavis and Jerry O'Neil the equal protection of the law to make and enforce contracts and to make claims or present evidence in court.

22.    **Wherefore and accordingly**, Plaintiffs move and request that this court declare that Jessica Lynne Reavis' contract of general and/or special agency with Jerry O'Neil is lawful and enforceable.

23.    **Plaintiffs further and additionally move and request** that Angela Reece Harris ought to be and should permanently be enjoined from disregarding this or similar agencies, and further that this Court should declare VA ST §15.02-1606 to be unconstitutional and discriminatory.

## BACKGROUND HISTORY OF INTERACTIONS BETWEEN JESSICA REAVIS AND THE D&E DEFENDANTS

A. In August 2018, Plaintiff Reavis (Jessica) noticed lubricant leaking from the front differential housing of the rear axel of her 2004 Freightliner Columbia.

B. Partly because all mechanics of the DE&E shop in Blairs, were advertised as ASC certified, and partly because Gammon & Gammon said they could get her truck in right away, on 8/28/2018 Plaintiff Reavis took her truck to DE&E to address the leak in the pinion gear seal in the front differential housing.

C. When DE&E looked at the leak, they pulled the magnetic drain plug off and notified Jessica that there were metal pieces present in the gear oil and on the plug; this a dangerous condition which could have caused failure to the rear end gears.

D. The shop forman suggested she replace the planetary gear with a new remanufactured pinion gear and differential assembly - and because she trusted them, based and reputation, she agreed to have them do so.

E. According to the very first DE&E invoice relating to this case, from September 2018, DE&E officers, agents, or employees, "found front differential leaking; removed front differential; found metal in

housing; bearing is coming apart; advised customer then installed reman unit; added lube; road tested and there were no leaks."

F. For this service DE&E charged Jessica $3,860.00.

G. Jessica paid the bill and picked her truck up from DE&E on 9/18/2018.

H. In December of 2018, Jessica complained that the rear end was leaking. They told me to monitor the situation.

I. On February 5, 2019, Jessica took her truck back to DE&E to have the steer tires replaced; a full 3-axle alignment; and a DOT inspection (by William Ricketts), which passed. Mr. Ricketts stated that there was no evidence of a leak on the differential.

J. After DE&E completed the 3-axle alignment, the DE&E mechanics, officers, employees, or agents, noticed that Jessica's steering wheel was not straight (the top did not align with the 12 o'clock position). At that time DE&E attempted to straighten the steering wheel but the mechanic failed to remove the 2 wires from the horn button. Because of this failure when he pulled off the steering wheel it broke (or busted, in any event destroyed) the wires that went down the steering column and evidently the wires were not retrievable, or, in the alternative, not retrieved through negligence or oversight.

K. After they lost the wires, they no longer attempted to fix the steering wheel at all (at all). Instead, they returned the truck to Jessica with the horn button broken and inoperable. This is a plain violation of DOT regulations, for which Jessica is personally liable.

L. Jessica also noticed after leaving the shop that there were gouges (some appeared to be more than a millimeter deep) on the right-side steer tire rim that were done (or somehow mysteriously occurred) when DE&E replaced the steer tires. Jessica observed it looked like they had kicked the rim, while lying on the shop floor. These gouges cannot be "buffed out" as DE&E mechanics offered.

M. On her first load out after leaving DE&E, Jessica took a load to Chicago, Illinois and then bobtailed (without a trailer) to Joplin, Missouri to change the company that she was contracted to.

N. In March, 2019, Jessica failed a DOT inspection with her new company because of the leaking differential seal on the front differential that she had previously complained about to DE&E, about the leaking in December 2018, and which they failed to recognize when the DOT inspection was done. This was the same seal that DE&E had replaced on 9/18/2018. These seals normally and usually last for multiple years, even on high mileage travels.

O. Jessica then called DE&E and notified them of the leak and they stated that they would fix the leak under warranty.

P. On 3/16/2019, on the way home, Jessica stopped at the TA Truck Center at Jeffersonville, Ohio and had a preventative maintenance done. This included an oil change and tractor lube. She also had the clutch pedal adjusted at that time. No problems were reported.

Q. On 3/26, 2019, Jessica returned her truck back to DE&E *for the warranty repair on the rear differential seal and horn button and the gouges in the steer tire rim* that was done on 2/5/2019 by DE&E. This "warranty work" was when the trouble really started.

R. The wires were not retrievable and the tabs to hold the horn button in the steering wheel were permanently broken. Jessica's $350.00 steering wheel, that she bought because she was proud of its looks, was jury-rigged with a horn button which could not be repaired.

S. Jessica notified DE&E of her horn button that was not working and the scratched rim that was also warranty repair from her last service visit of 2/5/2019.

T. Since she already had her truck in the shop, Jessica decided that since it had been some time since it had been replaced, she would

have the clutch and rear main seal replaced on her truck at this time, adding substantially to the extent and seriousness of the work to be done starting 3/26/2019.

U. When they replaced the clutch, they informed Jessica that the flywheel also needed to be replaced. Jessica agreed to have them do this replacement.

V. Jessica also requested DE&E to replace 2 seals on the back of the transmission while they were working on the truck.

W. On 4/22/2019, when Jessica returned to get the truck back, she noticed that the cover of the battery box and the step above it hadn't been reinstalled and she put them back on herself.

X. When she attempted to leave DE&E, her truck stopped running in their driveway for no apparent reason. After she wiggled the battery and starter wires the truck started and ran. She then drove back to DE&E and informed them about the cover on the battery box and that the truck had stopped running and that she had got it running again by wiggling the wires. Jessica was agitated and pointedly complaining about this gross negligence.

Y. The same day, again on her way home from DE&E, Jessica heard an abundance of road noise which prompted her to roll her window

down and then she heard what sounded like a metal clanking noise at slow speed.

Z. Upon arriving home, Jessica decided to look the truck over and informally inspect the repairs that DE&E had made.

AA.   She first noticed that the horn button had been moved from the center of the steering wheel to down on the steering column by her knees and had been replaced with an after-market horn button.

BB.   On further inspection of the stationary vehicle, she realized that the road noise was coming from where the shifter boot was improperly installed. When she lifted the floor mat up, she could see the transmission from the driver's seat and was able to touch the transmission from inside the cab.

CC.   Upon further observations, she noticed that the original bolts that were meant to hold the shifter plate in place had been broken off and new holes were drilled in the floorboard accompanied by additional bolts, some of which were not fully installed. This large gap between the floorboards and the shifter boot would have allowed carbon monoxide to have entered into the cab if she had an exhaust leak or was parked beside another truck with a bottom mounted exhaust system.

DD.  After finding these problems, Jessica went around the truck looking for what caused the metal clanking noise.  First, she noticed 2 unconnected bolts that were sitting in the holes on the step-plate over the battery box located between the fifth wheel and the cab of the truck.  Upon further observation, Jessica determined that these two "unconnected bolts" in fact belonged to the bell housing mounting bolts.

EE.  Then she continued to check out the truck, crawling under the truck, shaking the drive shaft, checking the bolts in the transmission, and she thus discovered that the dust shield was no longer attached to the second drive shaft between the carrier bearing and the front differential.

FF.  Jessica then immediately contacted DE&E to address these dangerous, grossly negligent, repair failures.  DE&E then sent one of their mechanics the 45 miles from Blair, Virginia to Jessica's home to address these very serious issues and problems.  This mechanic confirmed that these repairs could not be done at her home, instead the truck needed to be returned to DE&E's shop, and so it was on April 23, 2019.

GG.   Following his instruction, the next morning (April 23) Jessica returned her truck to DE&E's shop and left it in their care.

HH.   On 4/23/2019, after returning her truck back to DE&E, Jessica kept returning to, and/or calling DE&E, to see when she could return to work.   After many days she noticed that her truck remained in the same parking spot, apparently not being worked on at all.  Jessica then asked when they were going to finish the repairs and they then notified her they were no longer going to work on the inside of her truck because the mechanic had been bitten by bugs when working on the inside of her truck.   They then informed Jessica that they were going to set off a bug bomb inside the truck. Jessica declined to have a bug bomb set off inside the truck because her clothes and personal effects were located there.   She then requested proof of medical bills that were incurred as a result of the alleged bug bites that the mechanic supposedly, allegedly, had received.  They simply refused to provide Jessica any records of the mechanic going to receive medical care for anything, and (in retelling the story) the location of the flea bites kept changing from one part of the mechanic's body to another.

II. Specifically, another mechanic informed Jessica that the first mechanic had not gone for medical care, instead they had sprayed brake cleaner on his arm.

JJ. The parts manager claimed that he personally had seen the bug bites and that they were on the mechanic's neck. When Jessica informed him that others had said the bug bites were on his arm, this parts manager agreed that they might have been on his arm, rather than on this neck. This man also informed Jessica that the man who was bit was actually a student from the local high school.

KK. The sign on the front door of DE&E states "All mechanics are ASE Certified." Jessica states on information and belief that this student WAS NOT ASE certified. Being from VOTECH, a local trade school in Chatham, this high school student could not possibly be ASE certified yet.

LL. Jessica then called Paul Gammon and asked him how she could remedy this and get her truck fixed. Mr. Gammon informed Jessica that she would need to drive the 45 miles to Blair and drive her truck from the side of the shop and leave it at the back of the building so that they could continue to work on it. So, Jessica made the 90-mile round trip again.

MM. That is when Jessica noticed the improper and inferior (substandard) weld on the drive shaft and brought this to Paul Gammon's attention. Mr. Gammon then argued with Jessica and told her that is what a spot weld was "supposed to look like." Jessica then informed him that she had attended college where she learned to weld and had since worked in several shops welding and fabricating. Then Gammon became arrogant and irate, and said that they would redo the welds.

NN. A short time passed and then Jessica was notified that her truck was ready. She finally found a ride with her grandparents to take her to pick up the truck.

OO. On 5/1/2019, Jessica rode with her Grandfather and Grandmother to pick up her truck. After picking up the truck, they followed her towards her home to be sure that she had no problems.

PP. Jessica started home on the U.S. 29 North Business route, then merged onto regular U.S. highway 29 with her grandparents following in their normal passenger sedan. Within 2 miles of entering on U.S. Hwy 29, when Jessica went to pass another semi-truck, after pressing down the accelerator, she felt her truck begin to vibrate; then felt a hard impact. The middle drive shaft had

pulled far enough loose to allow the lubricant from the forward drive axle to spill out. Jessica observed that when she pulled over, the cars passing by were covered with oil.

QQ. Her grandparents' car was covered with oil and their windshield was covered with oil so thick that they could hardly see to drive far enough to pull over. It was extremely lucky that the cars following Jessica did not get into a major pileup because of the oil saturated highway and their oil saturated windshields---all of which were damaged and placed in danger by DE&E's gross negligence.

RR. Then Jessica examined her truck, saw where the driveshaft separated from the pinion gear and left a 2 to 3" gap between the driveshaft and the pinion gear seal.

SS. Jessica then observed and photographed the brake linings on the brake shoes which were covered with oil along with the frame rails.

TT. There was also present a large puddle of oil under the truck and a continuous stream on the highway leading to the truck. The oil stain is still there as of Monday, January 25, 2021.

UU. I contacted DE&E and made them aware of barely escaped disaster. They sent out a mechanic to survey the damage – as if he were going to fix the truck right there on the side of the road.

VV.   When the mechanic surveyed the damage and realized that Jessica's truck was beyond repair (at least easy repair on the side of the road), he sent for a wrecker to tow her 2004 Freightliner Columbia back to DE&E's shop.

WW. While waiting for the wrecker, Jessica went into the Dollar General and purchased some paper towels and Windex to clean off her grandparents' window, then got into their car and they went home, aggravated and dismayed.

XX.   At that time Jessica flew into an uncontrollable rage and sank into deep and despondent depression caused by the fear and horro that she came within a hair's breadth of killing her best friends, namely her grandparents, Spencer and Brenda Adkins and potentially dozens of other drivers in the cars that surrounded them.

YY.   The following day Jessica returned to DE&E to see the progress on the repairs. She talked to the shop foreman, "Doc", and informed him that the brake shoes were so saturated with oil they needed to be replaced. She wanted to make sure that there was no damage to the rear end. Doc notified her in an arrogant manner that DE&E was only going to fix the damage that they "deemed necessary, nothing more and nothing less."

ZZ.  At that point, Jessica came to the conclusion that they, the mechanics at DE&E were not going to do any more work on the truck.  She could no longer trust them properly to take care of the damage.

AAA. She then talked to Paul Gammon about the brakes.  He informed her that they would power wash the brake shoes to rid them of the oil; such cleaning was inadequate when the brake shoes had been oil saturated for several days.

BBB. When she came back to DE&E several days later, they had replaced the universal joint because the other universal joint had exploded when the drive shaft came loose.  This is highly irregular. They had also reattached the drive shaft along with the retaining nut that holds the drive shaft to the pinion gear.  This was the same nut that was not installed and thus caused the drive shaft to come loose in the first place.

CCC. When Jessica was getting ready to leave DE&E, Paul Gammon ordered his mechanics to pressure wash the brake shoes and the frame of the truck.  They did not remove the wheels from the axels when they pressured washed the brake pad edges.

DDD. When she got her truck back, approximately May 7, 2019, give or take a few days, after leaving DE&E, Jessica immediately took her 2004 Freightliner Columbia to Carter Machinery (Caterpillar) for a second look at and set of opinions on the damages.

EEE. When she arrived at Carter Machinery, she told them that she wasn't comfortable with DE&E's repairs; that on her way from Blair to Lynchburg, things did not seem right.

FFF. She told Carter Machinery to: check to see if the following components were installed correctly: the clutch, flywheel, rear main seal, transmission, steering column, front and rear drive shaft, and the front rear brake shoes, and to see if the rear end had been flushed and changed.

GGG.     Also, Jessica instructed the Carter employees to take an oil sample from the front rear differential for contaminants and to clean the oil from the truck and adjust the clutch if needed.

HHH.     On May 28, 2019, Carter Machinery found that the rear drive shaft was out of phase, the rear main seal was leaking, the shift boot was not installed correctly and they took pictures and gave these pictures to Jessica by email.

III.   After assessment, they took the broken bolts out of the floorboard and "re-tapped" the holes. They then adjusted the rear shift boot to match the holes so that it was installed properly. They filled in the extra holes with rivets. They then checked the steering column mechanism that DE&E installed and found that it was not installed correctly.

JJJ.   Carter Machinery stated that they could not correct parts to repair the sliding yoke on the front differential, so they went to another service center and vendor called "Truck Body" to get parts and then installed a new seal and yoke. Carter corrected the driveshaft alignment and balance and reinstalled it.

KKK.   On June 10, 2019, when Jessica finally got the truck back from Carter Machinery, she drove it from Lynchburg, Virginia 66 miles to Roanoke, picked up an empty trailer and immediately returned to Carter Machinery where she complained about the truck being hard to get in and out of gear. They inspected and adjusted the clutch and sent her on.

LLL.   Then Jessica took a load from Lynchburg, Virginia to Laredo, Texas. She then returned to Lynchburg, Virginia, where on July 1, 2019 she again complained to Carter Machinery about the same

problem, namely that the transmission was hard to change from high to low range and was not going into gear very well. They checked the clutch adjustment, found it to within specs, then checked the transmission yoke and found that it had play. They tightened the transmission yoke and found that it still had play. They then tested the truck on the yard and found that it had hesitation when going from high to low on the transmission. Then they checked the air line to the splitter valve and they decided that the problem was with the back box of the transmission.

MMM.     At that time, they suggested replacing the transmission rather than rebuilding the old one, so they then installed a remanufactured transmission in Jessica's truck. When they drained the transmission oil they did not find any debris in the transmission fluid. When they removed the transmission, they attempted to exchange the old parts from the old transmission to the new transmission, but were not successful removing the old slip yoke from the old transmission; it was seized on the transmission.

NNN.     Then they installed the new remanufactured transmission and Jessica took a load from Richmond, Virginia to North Dakota.

OOO.    On the way, Jessica noticed a puddle of oil under the truck where the transmission was. She did not crawl under the truck the first day and hoped it was not hers considering that she had a brand new transmission on the truck. The next night she found a spot to park her truck that did not have evidence of some other truck having leaked oil. When she looked under the truck the next morning, she discovered another puddle of oil and found that it was leaking from the brand new transmission.

PPP. So then she contacted Carter Machinery and notified them that the transmission was leaking oil. They instructed Jessica to bring the transmission to them or to have it fixed on the road.

QQQ.    On July 19, 2019, Jessica took her truck to Westlie Truck Center at Dickinson, North Dakota and they inspected the new transmission to see what to do about the leaking oil.

RRR.    When Westlie Truck Center checked on it, they found that there was no gasket between the transmission and the bell housing. They also found where a universal joint had been ruined by the use of a torch and was unsafe.

SSS.     Jessica contacted Carter Machinery again to let them know of her findings. They agreed to pay for the gasket needed as well as the bill to fix the universal joint.

TTT.     Westlie Truck Center then continued their repair and dropped the bell housing. Upon removal of the bell housing they cleaned and inspected it and found that it was cracked like the Liberty Bell in Philadelphia.

UUU.    Jessica was in a state of actual physical shock and near emotional collapse. After all these months, she had just found out that the thousands of dollars she had spent that this was the first time anyone had looked at the bell housing.

VVV.     This was simply devastating, beyond merely frustrating, to realize that she still was not finished, that she still had to fix the damages previously found that were caused by DE&E's failure to install the bolt on the slip yoke. They should have seen this coming. DE&E was reckless. They only did what they wanted to. They did not care what was right or wrong. They were totally unprofessional.

WWW.   Carter Machinery paid Westlie $2,185.95 for putting the gasket on the bell housing and putting the new universal joint on.

XXX.    Jessica then paid Westlie $801.51 additional for removing and inspecting the cracked bell housing and installing a new bell housing.

YYY.    Shortly after leaving Westlie Truck Center the ABS (automatic brake senser) light luminated on the dash board. Jessica attempted to reset the code but the light came back on immediately.

ZZZ.    On August 19, 2019 Jessica returned to Carter Machinery and instructed them to check the rear set of brakes again. They replaced the rear brake shoes and drums and the ABS light turned off. This cost Jessica an additional $1,200.11.

AAAA.   This was less than 50 days after DE&E told her they could fix the oil saturated brakes by power washing them without removing the wheels and after the brakes had remained oil soaked several days.

## Count II: Federal Regulation implies Federal Cause of Action to Enforce and for Negligence Per Se against DE&E

24.    Virginia Courts have held that the doctrine of negligence per se represents the adoption of the requirements of a legislative enactment as to the standard of conduct of a reasonable business. *Kaltman v. All American Pest Control*, 281 Va. 483, 496, 706 S.E.2d 864, 872 (2011).

25.    Defendant DE&E has violated statutes, both state and federal, especially but not limited to Federal Motor Carrier Safety Improvement act and the regulations of the Federal Motor Carrier Safety Administration, and other DOT regulations, enacted for public safety in relation to the maintenance and repair of motor vehicles (commercial trucks) in interstate commerce.

26.    Plaintiff Jessica Lynne Reavis belongs to a class of persons, namely interstate truck drivers, for whose benefit these statutes were enacted and regulations promulgated.

27.    Plaintiff Reavis also belongs to another class of persons, namely other drivers who share the roads and highways with interstate truck drivers, for whose benefit these and other statutes were also enacted and regulations promulgated.

28.    The harm and injuries that occurred here were of the type against which these certain statutes and regulations in question were designed to protect.

29.    DE&E's statutory violation of the Federal Motor Carrier Safety Improvement act and the regulations of the Federal Motor Carrier Safety Administration is the proximate cause of Plaintiff Reavis' injuries in this case.

30. **WHEREFORE AND ACCORDINGLY,** Plaintiffs O'Neil & Reavis ask this Court to declare, establish, and implement in this case a cause of action for negligence per se or gross negligence per se, arising from the Federal Motor Carrier Safety Improvement act and the regulations of the Federal Motor Carrier Safety Administration.

31. **This statute** especially applies when a service provider's negligence or gross negligence places innocent third parties, including Reavis' grandparents and unrelated motorists on the public highways, in clear immediate and proximate, and therefore legal, danger of death or mayhem due to mass automobile accidents resulting from oil leakage from large 18-wheeler trucks, as happened on or about May 1, 2019.

32. Federal Department of Transportation (DOT) regulation of interstate trucking sets standards for the maintenance of large trucks such as those which Plaintiff Jessica Lynne Reavis has driven for the past twenty years.

33. DE&E Defendants' incompetent and substandard repair knowingly and recklessly exposed Reavis herself to risk for liability for driving IMMEDIATELY after per se negligent or per se grossly negligent "repair" and servicing, thereby creating a clear and present danger of causing serious danger of death and consequent emotional trauma to innocent and unconnected third-parties, in addition to the infliction of such distress on

Reavis herself, including but not limited to Plaintiff's late grandfather Spencer Eugene Adkins and her grandmother Brenda Adkins.

34.   The conduct of Defendant DE&E alleged herein below violates the letter and purposes of the Federal Motor Carrier Safety Improvement Act of 1999 and regulations promulgated by the Federal Motor Carrier Safety Administration (FMCSA), and DOT, as well as Title 49, Chapter 301 generally.

35.   Plaintiffs allege that under 28 U.S.C. §§2201-2202, and 42 U.S.C. §§1983, 1988(a) (and related Bivens principles), this United States District Court has the power to construe an implied Federal cause of action against DE&E given the vagueness and contradictions of Virginia State Law.

36.   Plaintiff Jessica Lynne Reavis drives under the supervision of the United States Department of Homeland Security.

37.   Plaintiff Reavis is thus specially certified for sensitive cargo, also giving rise to special reasons for Federal regulation and oversight, and support for implication and inference of a Federal cause of action for negligence per se, gross negligence per se, or reckless endangerment per se against DE&E.

**Count III: Virginia Source of Duty Rule Violates 14th Amendment**

38.   Plaintiffs reallege the relevant and material factual allegations of §§1-37 above, and incorporate the same by reference herein below as if fully restated and recopied herein below.

39.   DE&E raised as a defense a principal of state common law or precedential jurisprudence in the Pittsylvania Circuit Court of the Commonwealth of Virginia as construed and applied in the state Supreme Court(See October 22, 2020, Memorandum in Support of Demurrer, Exhibit C, @ 2-3):

> In determining whether a cause of action ***sounds in tort, contract, or both***, the source of duty violated must be ascertained.  In making this determination, we examine the specific nature of the allegations of negligence: If the cause of complaint be for an act of omission or non-feasance which, without proof of a contract to do what was left undone, would not give rise to any cause of action (because no duty apart from contract to do what is complained of exists) then the action is founded upon contract, and not upon tort.  If, on the other hand, the relationship of the plaintiff and the defendants be such that a duty arises from that relationship, irrespective of the contract, to take due care, and the defendants are negligent, then the action is one of tort.

*Tingler v. Graystone Homes, Inc.*, 298 Va. 63, 81-82, 834 S.W.2d 244, 255 (2019)(bold and italic emphasis ended).

**40.**   Plaintiffs submit that this distinction is so highly formalistic and rigid a definition as to be incomprehensible and void for vagueness or overbreadth

in the real world, and pray that this Court should declare the Virginia "source of duty" doctrine unconstitutional.

## NATURE OF JESSICA REAVIS' RELATIONSHIP WITH DE&E "BOTH" CONTRACTUAL AND INTERACTIVE PERSONAL, INDIVIDUAL, AND/OR RELATIONSHIPS OF TRUST & CONFIDENCE, i.e. SUBJECT to "TORT"

41.     When an employee, independent agent, or contractor interacts, within the scope of his or her employment, with a corporation's individual customer, for purposes of providing service, is that employee, agent, or contractor liable solely pursuant to a contractual relationship, or for his/her own torts such as fraud, gross negligence, misrepresentation, mere negligence, recklessness, or intentional infliction of emotional distress?

42.     Plaintiff Reavis has named Paul and Sharon Gammon and up to twenty employees of DE&E as "John Doe" Defendants because of her individual and personal interactions with them, and because of her reliance on their individual and personal representations and implicit relationships of professional trust and confidence with her, in much the same manner as a medical doctor (Plaintiff's truck is her life's blood and personal home for much of the year).

43.     Plaintiff Reavis freely admits that her only direct and (partially) written "contracts" were with DE&E, but that the details of the work to be done on

her truck were worked out individually and personally with Paul Gammon and all the other named and "John Doe" Defendants who were employees or contractors or journeymen for DE&E.

44.   Reavis' "relationship" with DE&E was originally and intentionally contractual, but her interactive, working relationships with Gammon, "Doc" and the other "John Doe" Defendants operated basically as those of a personal consumer seeking personal services with individuals.

45.   When Plaintiff Reavis asked them questions, they listened and answered, or they at least purported (pretended) to do so, and when they answered, they lied to her, or misled her about the work they were doing.

46.   When they laughed at Reavis, they laughed at her personally; they were acting as individuals, as persons purporting to provide her with their services (or denying her their services) directly, without any reference to the contract.

47.   On these occasions, the actions and behavior of Defendants Gammon and the John Doe employees (on whose behalf Clint Verity et al have appeared in the Virginia 22nd circuit court) was not merely negligent, but in fact were willful, wanton, and vindictive: very expressly and verbally so.

48.   Although "physical impact was lacking," meaning that, by some Divinely Ordained Miracle, neither Reavis nor her grandparents nor anyone else was hurt, such injury was a constant threat resulting from DE&E's long

and successive program of repairs and remedial actions taken after improper and incomplete repairs.

49. Death and mayhem were clear and present dangers as potentially resulting from DE&E's improper mechanical services.

50. And for any damage to third parties from these improper repairs, Plaintiff Jessica Reavis would have been held primarily and personally liable.

51. Had any highway mishaps occurred, Plaintiff Jessica Lynne Reavis would have suffered damage and injury not only to her truck and her person (physical and emotional state).

52. Jessica Lynne Reavis would also have suffered also her career, and her psyche, and she would simply have been crushed in the event of the multicar accident that might have occurred as a result of oil pouring out of Plaintiff Reavis' truck as the direct result of DE&E's incompetence and, what can only be called, in plain English, negligence or gross negligence.

53. And such a multicar accident actually almost did occur on May 1, 2019, as Plaintiff Jessica Lynne Reavis, accompanied by her grandparents, both then over eighty years of age, as they drove home immediately after her truck's release from DE&E custody.

54. If it had not happened on May 1, 2019, it could have happend sometime soon thereafter if Plaintiff had relied solely on DE&E to perform its

contractual and/or tort-based obligations to her as a truck-driver subject to DOT regulations on the public highways.

55.   That is why a newly inferred cause of action for negligence or gross negligence per se must be recognized in this case.

56.   The Gammons and John Doe Employees insulted the Plaintiff personally and tried to belittle her to her face in order to avoid working in a timely and professional manner.

57.   Abusively, these Defendants implied Plaintiff Jessica Lynne Reavis was somehow inferior and nasty for keeping dogs in her truck, but the Gammons had a large number of dogs in the DE&E office and shop. And besides, for her part, Reavis maintains her animals very well, free of fleas and in the care of a competent veterinarian.

58.   The DE&E mechanics and other employees were just making up stories and trying to cover for their own incompetence, "as individuals", "as employees, agents, apprentices or journeymen" of DE&E, but Reavis dealt with them all as individuals directly since approximately 8/28/18.

59.   Paul Gammon and the DE&E John Doe Defendants, "Doc" and others, lied to Jessica Reavis directly and, as much as they were able, misled her about their own personal negligence/gross negligence/recklessness.

60.   The individual defendants, although employees of DE&E, owed Jessica Lynne Reavis common law duties (and Virginia Consumer Protection Act duties) of honesty and candor in the provision of services.

61.   Jessica Lynne Reavis was a consumer of the services Paul Gammon and the DE&E John Does provided.

62.   But in her capacity as a consumer, for nine months continually, Jessica was a victim of ignorant sexual stereotyping.

63.   These defendants always acted as though they assumed that Reavis was a just dumb woman even though she drives trucks professionally, and that she didn't know anything about what they were doing.

64.   The DE&E Defendants treated Plaintiff as an inferior whose opinions and concerns as a consumer of their (allegedly, supposedly) professional services were entitled to no attention or respect at all.

65.   Only AFTER Jessica Reavis asked why the work was taking so long, did DE&E employees seek to excuse themselves and complain about Reavis' truck and ask to bomb it for fleas.  They thought it was hilarious that they had to violently abuse her truck's transmission, to get the parts to fit back together after they took things apart, and they said all this to Plaintiff Jessica Lynne Reavis' face as individuals and as a group.

66.   So, in sum, Plaintiff Jessica Lynne Reavis' relationship was BOTH contractual, founded upon contract, and generally as a social consumer, with individual providers of individualized services, subject to tort and Virginia Consumer Protection Act duties.

67.   As stated above, in "Background" on May 1, 2019, when Reavis got her truck back after the last major repairs (at DE&E), she was horribly upset, knowing that her "repaired" truck, after being in the shop on-and-off, almost continuously, since August of 2018, almost killed her elderly grandparents and/or might have caused a major accident.

68.   It was very personal when Plaintiff Reavis went back on May 2, 2019, and talked to the shop foreman, "Doc." Reavis told him to check the pinion gear and all the bearings in the universal joints, and he told her, "we are only going to fix **what we deem necessary**, nothing more, nothing less."

69.   In other words, as stated above in the background history, this individual managing employee "Doc", in his supervisory position as foreman, was dealing with Reavis individually, giving her his ("Doc's") personal guarantee and evaluation, and defying the whole idea of any contractual parameters, professional standards, or respecting what Jessica Lynne Reavis thought was necessary.

70.   Whatever happened to the maxim: "the customer is always right?"

71.     They (the employees, officers, and agents of DE&E, including Paul and Sharon Gammon) did not want to do the repair work necessary to keep Reavis or anyone who shared the highway with her safe, to make her truck safe for the highways, or to comply with DOT or FMCSA regulations.

72.     Reavis interacted with Paul Gammon, the owner of the company, on April 23, 2019.   On that date she complained to Paul Gammon about the inferior welds on the drive shaft and asked him to redo these welds.

73.     She was worried about the drive shaft being out of phase.  [Driveshaft phasing is the process of aligning the driveshaft, U-joints, and slip yoke to balance and prevent unwanted vibration from the vehicle's driveline system].  This would also include it being out of balance, plus there were problems with an improvised horn button and the shifter boot.

74.     Paul Gammon argued with Reavis and told her that was what a "spot weld" was supposed to look like, and he promised to bring a part down from the parts department and show her that is what a spot weld is to look like.

75.     In other words, Paul Gammon was personally trying to persuade Reavis of a falsehood to his advantage as a provider and to Reavis' disadvantage as a consumer.

76. To defend himself against Reavis' accusations, Paul Gammon first became irate when he learned about Reavis' prior welding experience, but then agreed he would fix this critical part.

77. Reavis had worked closely with another "Defendant John Doe" employee, whom Plaintiffs will call "the parts guy," who before about April 22, 2019, would talk to Reavis, but after then would not speak to her again.

78. Quite simply, Reavis had personalized interactions with everybody who worked at DE&E, including the times when she complained to Paul Gammon, the mechanics, and Reavis expressly complained about the quality or completion of the services, including, the use of cold welds, soldering, and they ignored her as an individual, they ignored her personally, and the truth is that there was no detailed line item written contract, only specifically discussed conversations about the needs of the truck---so Plaintiffs ask, is this contract? Tort? Contort? Violations of VCPA? Or all of the above? Plaintiffs answer: ALL OF THE ABOVE.

79. Plaintiff Jessica Lynne Reavis submits that her relationship with the Defendants was not completely outlined or governed in every aspect by any complete, express or detailed contractual agreements.

80. Rather, the DE&E agents, employees, mechanics, officers, and specialists controlled and individually decided, or allocated, their

*Jerry O'Neil & Jessica Lynne Reavis, v. Angela Reece Harris,*
*Paul & Sharon Gammon, Diesel Engine & Equipment Repair, et al.*                    Page 38

"voluntary" consent to work and do the work which was actually necessary, or not, while DE&E as a corporate contracting entity just charged Jessica Reavis for work these employees either did not actually do, or did so shoddily as to cause damages far in excess of merely unsatisfactory services, the true damages being a multiple of the amount Jessica paid.

81.   Jessica's emotional damage and psychological injuries resulting from fear and anticipation of potential consequences is deeper and further still.

82.   Reavis & O'Neil submit that Reavis' relationship with the employees of DE&E was so entirely personal, so entirely interactive, that the common law duties of a service-providers honesty and forthrightness predominated over the substantive details of any express contract which were just a series of general work orders and a series of bills and invoices.

83.   ALL details of these contracts were ad hoc and negotiated and described with the individual employees, who each owed Plaintiff at the very least common and statutory law obligations of candor, honesty, and professional integrity, violated or vitiated both by incompetence and actual fraud.

84.   The nature of the services was exactly in the manner of a provider to an ordinary (if relatively technologically sophisticated) consumer.   Yes,

Plaintiff Reavis, despite being a blonde girl, really did know about trucks, she has worked in truck maintenance shops.

85.    But Reavis is not in the business of repairing trucks and she never was; Reavis certainly never would have gone to DE&E or Carter Caterpiller or Westlie Truck if she had had her own "in house" shop where she could perform her own repairs.  Reavis was A CONSUMER FOR PERSONAL USE, even if her personal use was to make a living.

86.    Otherwise, Virginia Contract, Virginia Tort, and VCPA are all worthless and meaningless laws if construed in such a way that negligence or gross negligence in the performance under a contract by real, living, individuals acting on their own initiative in the scope of their employment is not actionable; the nature of the transaction precludes reliance on the specific written provisions contract alone.

87.    Reavis submits that she is in every sense a consumer.   However experienced with trucks she may be, despite being a blonde, Reavis certainly is not, nor ever claimed to be, an ASE certified mechanic.

### INJURIES ARISING from DE&E GROSSLY NEGLIGENT REPAIRS

88.    As a direct and proximate, and therefore legal, result of Defendant DE&E's convergent bad faith breach of contract,  negligence per se, gross negligence, or recklessness in the performance of their contract or contracts

for truck repair and maintenance with Plaintiff Jessica Lynne Reavis, the lives of Plaintiffs Reavis and Adkins were threatened immediately after the supposed conclusion of DE&E's services when Reavis' truck was leaking oil sufficient to create a hazardous condition on the highway and cover her aged grandparents' car (as well as other people's cars) in the oil which was not so much leaking as spraying from her "repaired" truck after months at DE&E.

89.    This level of threatened injury exceeds the normal kind of damages resulting from a breach of contract, because the negligence, gross negligence, or recklessness in performance of the contract in which DE&E engaged exceeded all boundaries of reason, commercial expectation and standards.

90.    Every contract in Virginia carries with it an implied covenant of good faith and fair dealing implied, the breach of which gives rise to a cross-between contractual and tortious liability.

91.    Does Virginia Law negate the possibility of "Contorts" (Contractual Torts?).  If so, what is the meaning of the Virginia Consumer Protection Act?

92.    The "source of duty" rule is incompatible with the judicial recognition of the existence, recognition, and delineation of the implied covenant of good faith and fair dealing.

93.    Likewise, where breach of contract leads to destruction of property, as it did in the case of DE&E's "repair work" of Plaintiff Jessica Lynne Reavis'

freightliner, the line between breach of contract and the tort of conversion by destruction of property is likewise blurred, and would be obliterated by the source of duty rule, if such a rule is allowed to exist.

## THE VIRGINIA SOURCE OF DUTY RULE IS UNREALISTIC and RESULTS in LOGICAL ABSURDITIES and MANIFEST INJUSTICE

94.    In the 22nd Circuit Court of Virginia, in Pittsylvania, Attorneys for Defendant DE&E have raised this defense under Virginia law which is unconstitutionally void for vagueness, namely "the Source of Duty Rule."

95.    The recent *Tingler v. Graystone Homes* opinion builds upon earlier cases and apparently constitutes a continuing doctrine in Virginia jurisprudence:

> ...losses suffered as a result of the breach of a duty assumed only by agreement, rather than a duty imposed by law, remain the sole province of the law of contracts.

*Kaltman v. All American Pest Control, Inc.,* 281 Va. 483, 493, 706 S.E.2d 864, 869-70 (supra)(Virginia 2011).

96.    This Court has the power to declare statutory or common law delineated in Virginia's courts to violate of the Federal Constitution.

97.    Plaintiffs ask this Court to declare and adjudge that this "Source of Duty" rule, as stated above, is so vague and ambiguous as effectively to nullify and in fact to eliminate both contractual and tort obligations in any *commercial or consumer transaction* in the State of Virginia, and

further to abolish, nullify, and obliterate the Virginia Consumer Protection Act, which by definition merges obligations arising from contract and obligations arising from tort into a single statutory scheme.

98. Using this "source of duty" rule, it will always be possible for a defendant to assert that the Plaintiff Jesssica Lynne Reavis has mixed contractual damages with tort damages, in any situation involving complex or indirect causation, such as the oil blasted onto Reavis grandparents' car, nearly killing them.

99. In other words, "source of duty" doctrine obliterates the doctrine of proximate cause all together, and thereby reverses 100 years of contract and tort liability since Judge Benjamin Cardozo handed down the decision in ***Palsgraf v. Long Island Railroad Co.,*** 248 N.Y. 339, 162 N.E. 99 (New York Court of Appeals 1928).

100. WHEREFORE and ACCORDINGLY, Plaintiffs ask this court to declare the Virginia "source of duty" rule unconstitutional as void for vagueness in violation of the 14th Amendment to the Constitution of the United States.

101. Furthermore, Plaintiffs O'Neil & Reavis ask this Court to declare and adjudge that claims for either Negligent or Intentional Infliction of Emotional Distress or both should be allowed when a service provider places a consumer at risk of injuring her own relatives (elderly grandparents) by

and solely because of the service provider's negligence, and/or when a service provider places a consumer at risk of mass tort liability to unknown third-parties for the operation of a dangerous instrumentality upon the public highways, when these repairs were entrusted to the service providers both by contract and individual, personal, relationships of confidence and trust through dialogue, discussion, and examination of needs and situations.

## COUNT IV: DEFENDANTS' GAMMON, DE&E, and JOHN DOES 1-20 for NEGLIGENCE, GROSS NEGLIGENCE & RECKLESS ENDANGERMENT

102.  Reavis and O'Neil hereby reallege ¶¶1-101 and incorporate the same by reference as if fully set forth and recopied herein below.

103.  Reavis was a party to the contract between Reavis and DE&E, but she was liable to unknown expressly intended third-party beneficiaries of the contract, to the degree that all members of the public were intended third-party beneficiaries of the freight hauling "essential services" provided by Reavis, and Reavis was liable to this public for driving a safe and well-maintained, non-oil spraying vehicle along the interstates and other pubic highways.

104.  Wherefore and accordingly, even under the "source of duty" rule articulated by DE&E as a defense to Reavis' suit in the State Court, Reavis has standing to sue for negligence, gross negligence, and reckless

endangerment, especially since their role in assisting Reavis was obvious to and thus expressly known to Gammon, DE&E, and other (Doe) Defendants.

105.   Reavis was in the special zone of danger and risk of proximate injury from DE&E's Negligence, Gross Negligence, or Reckless Endangerment.

106.   Defendants DE&E, Gammon, and certain John Does caused Reavis' grandparents' car (and several other cars) to be bathed in oil at the same time as creating a dangerous public condition on the highways which endangered Reavis and every other traveler on the highway leading from DE&E's repair facility in Blairs, Virginia.

107.   Plaintiff Jessica Lynne Reavis owns her own commercial truck, being a 2004 model Freightliner Columbia, VIN #1FUJA6AV34LM16135.

108.   Reavis has driven this truck since it was brand new in June 2003 (new @15,000 miles); she purchased it at 475,000 miles (when she became a lease operator) and has been a business owner since 2007.

109.   Reavis now has 2,000,000 miles on her Freightliner and she has maintained it throughout, and with complete maintenance records as required by Title 49 of the U.S. Code and the regulations promulgated by the Federal Motor Carrier Safety Administration.

110.   Between August 28, 2018 and May 1, 2019, Plaintiff Reavis, with the help of her grandfather the late Spencer Eugene Adkins[1], repeatedly took her truck in for repeated servicing, repairs and replacement of parts and equipment at DE&E for a series of closely related problems, none of which were resolved in that entire period of eight months during which Reavis left her Freightliner with DE&E on at least six occasions.

111.   Plaintiffs attach all of Reavis' receipts from DE&E (and CFI) from August 28, 2018 through May 1, 2019, under the cover sheet and label of "Exhibit D" and affirm and certify that these are true and correct copies of the originals issued by DE&E (and CFI) in Reavis' possession and available for inspection or submission in court.

112.   As these receipts clearly show, Reavis' originally went to DE&E Repair on August 28, 2018, returning September 18, 2018, February 5, 2019, February 28, 2019, March 15, 2019, March 26, 2019, April 22, 2019, April 23, 2019, April 26, 2019, in April returning almost daily.

---

[1]   Spencer Eugene Adkins had originally planned to join this lawsuit as one of the Plaintiffs in this case, but Plaintiff Jessica Lynne Reavis' 82-year-old grandfather tragically was infected by COVID-19 and passed on into greater glory on Saturday, December 19, 2020, and the management or position of his estate's executor in Virginia probate has not yet been determined.

*Jerry O'Neil & Jessica Lynne Reavis, v. Angela Reece Harris,*
*Paul & Sharon Gammon, Diesel Engine & Equipment Repair, et al.*                    Page 46

113.   On or about May 1, 2019, Reavis finally got her truck back. Within the first 2 miles when she took it on the road, the driveshaft separated from the pinion gear and nearly fell out of the truck. This was caused by DE&E's negligent installation.

114.   When the driveshaft between the carrier bearing and the front differential came loose within the first 2 miles on the road, Reavis' grandfather and grandmother were following her. The oil escaping from the truck's front differential covered their windshield, the windshields of several other cars, and nearly caused them to be involved in a multiple car accident on the highway.

115.   The leaking oil being explosively discharged from Reavis' (supposedly repaired) vehicle created an oil slick along the highway.   Reavis' grandparents following her were placed in fear and apprehension, and, objectively, in clear and present danger.

116.   DE&E then towed Reavis' truck back to their shop where they had to replace the Universal Joint and restore the pinion gear bolt on the driveshaft.

117.   Paul Gammon and other John Doe Defendants at DE&E had failed to make this critical repair before giving the Freightliner in question back to Reavis, all the while claiming that they had.

118.   WHEREFORE, Plaintiff Jessica Lynne Reavis prays for her damages directly and proximately and therefore legally resulting from the DE&E Defendants (including John Does 1-20) tortious negligence, gross negligence, or reckless endangerment, in an amount exceeding $75,000.00.

## COUNT V: BAD FAITH BREACH of CONTRACT and CONVERSION (Contract, Tort, Contort or VCPA?)

119.   Plaintiff Jessica Lynne Reavis realleges ¶¶1-118 as if fully restated and recopied herein below, and incorporates the same by reference.

120.   Plaintiff Jessica Lynne Reavis submits that her allegations herein above, together with DE&E's invoices and receipts (Ex. D), support her contractual allegations.

121.   As of that fateful and nearly fatal ride on May Day 2019, Reavis could no longer trust the work that DE&E had been doing or any more of their false promises.

122.   For the purpose of confirming but also mitigating her damages, Reavis took her truck to Carter Machinery in Lynchburg, Virginia.   She was frustrated by DE&E's massive delays and the seeming complete incompetence of the individuals Paul Gammon, "Doc", "the parts guy" and John Does 1-20 who were working on her truck.

123. Reavis had already by this time suffered catastrophic loss of income and just plain serious stress she was suffering as a result of her truck being repeatedly, almost continually disabled, as well as for the threats to the welfare of her supportive grandparents.

124. Reavis specifically asks this court to allow and award her to plead both tort and contract remedies including not merely financial loss but also emotional and stress related injury as a result of DE&E's and the Gammons' and John Does 1-20's negligence, gross negligence, reckless endangerment, breach of contract, breach of the implied covenant of good faith & fair dealing, and/or violation of the Virginia Consumer Protection Act.

125. DE&E's actions and conduct in all three legal realms of tortious negligence, conversion, bad faith contractual, and violations of VCPA were so inextricably intertwined that she will be unconstitutionally denied substantive due process, redress of grievances and compensation for injuries if the DE&E Defendants' above-described Virginia "source of duty" rule were to be sustained, tolerated, or upheld in this Court.

126. After no fewer than six separate episodes of entrustment of her truck to DE&E, the brakes on her Freightliner truck were still covered in oil and Reavis was worried that the driveshaft was out of phase and out of balance

because of DE&E's gross incompetence, including their shoddy welding work.

127.   During May, July, and August of 2019, Carter Machinery (Caterpillar) went back over everything that DE&E had done since August of the previous year, and advised Plaintiff Reavis as follows:

    (a)    The rear main seal was still leaking;

    (b)    There were holes in the floorboard with bolts missing and/or broken off;

    (c)    The driveshaft was out of phase, balance and alignment;

    (d)    The shifter boot was still installed incorrectly; and

    (e)    DE&E had destroyed the old steering column by ripping the wires loose and then losing them inside the steering column. They then installed a used steering column which still does not work properly.

128.   Carter Machinery Company then:

    (a)    Replaced the rear main crank seal again;

    (b)    Sent the driveshaft(s) off for balancing and installed a new dust shield;

    (c)    Adjusted the clutch;

    (d)    Fixed the shifter boot and filled "extra" holes with (metalloid) silicone and rivets;

      (e)    Replaced the entire transmission; and

      (f)    Tightened the transmission yoke,

129.  Plaintiffs attach all Reavis' receipts from Carter Machinery under the cover sheet and label of "Exhibit E."

130.  Only because of the work at Carter Machinery, Reavis was able to resume some regular work during the summer of 2019.  But she still ended up at Westlie Truck Center Western Star in Dickinson, North Dakota, with continuing problems.

131.  The technical staff at Westlie Truck Center notified Reavis that she had continuing problems with her bellhousing being cracked and the required gasket not being there.

132.  Westlie concluded that the bellhousing was cracked beyond repair and required replacing the bellhousing, gasket and universal joints which had been burned, charred and rendered dangerous by a torch.

133.  The problems with the bell-housing were directly attributable to negligent, grossly negligent, reckless, or possibly intentional incompetence.

134.  After DE&E's sloppy work, Reavis could no longer get her truck easily into gear.

135.  Inability to shift gears is a dangerous condition, creating a per se violation of DOT-Federal Motor Carrier Safety Administration (FMCSA)

*Jerry O'Neil & Jessica Lynne Reavis, v. Angela Reece Harris,*
*Paul & Sharon Gammon, Diesel Engine & Equipment Repair, et al.*       Page 51

Inspection, Repair and Maintenance Regulations, and this dangerous condition was the result of something worse than mere negligence: either recklessness or intentional, willful damage.

136. As an independent contractor, who carries $1,000,000.00 liability insurance policy, Plaintiff Jessica Lynne Reavis, as a truck-driver, is responsible to the DOT and FMCSA for the proper maintenance, operation, and safety of her truck, but she contracted with DE&E, Gammon, and their employees or independent contractors John Does 1-20 to ensure compliance, especially in light of her special clearance with the Department of Homeland Security.  An individual, personal truck driver such as Jessica Lynne Reavis depends on the competence of DE&E and its agents, officers, and employees.

137. DE&E employees' conduct and oral expressions of callous and unthinking glee on several occasions to Reavis personally, were not merely unprofessional, but were extreme and outrageous, unacceptable in any civilized society given the life-and-death seriousness of driving an over the road truck on the public highways.  One consequence of their unprofessional conduct was that it caused Plaintiff Reavis and her grandparents, her grandfather having just now passed away on December 19, 2020, severe emotion distress in the form of visceral anger, anxiety, nerve strain, stress and sleeplessness due to concern and worry and fear for her safety.

138.   For Gammon, DE&E and the John Doe Defendants to inflict and cause this kind of emotional distress and professional stress should be recognized as an actionable, compensable damage in this case.

139.   Plaintiff Jessica Lynne Reavis has suffered extreme symptoms of anger and stress, including sleeplessness, severe anxiety, depression and feelings of hopelessness and inability to recover from the injuries inflicted by DE&E, Gammon, and the John Doe Defendants.

140.   Plaintiff Reavis attaches her receipts from Westlie Truck Center in Dickinson as Exhibit F.

141.   Reavis documented all these events and occurrences and conditions with photographs which they herein attach as Exhibit D.

142.   Plaintiff Jessica Lynne Reavis can identify, explain, describe, and date the significance of each of these photos upon proper request.

143.   DE&E, Paul Gammon, and others among the John Doe 1-20 Defendants had repeatedly notified Reavis that her Freightliner Columbia was ready for pickup and full commercial use, which they obviously knew and understood included driving cross-continent from Virginia to Laredo, Texas, to the Canadian Border, Seattle, and back, often via Colorado, Nebraska, Illinois, Louisiana, Georgia, and/or Florida;

144. The DE&E Defendants' oral and electronic notifications of Reavis' Freightliner's readiness constituted an express warranty of their work and certification of completion of contractual work in good faith.

145. The operability and safety of her truck is her entire life and livelihood.

146. Plaintiff Reavis had taken her Freightliner to the Defendants for the purpose of securing appropriate maintenance and repairs.

147. Reavis always, carefully and with professional diligence, based on twenty years commercial driving experience, pointed out the problems she was having with her truck.

148. Reavis exhaustively discussed all issues with Paul Gammon and the John Doe 1-20 mechanics (including the Doe Defendants and Gammon's somewhat preposterous allegation, at one point, that an infestation of fleas was impeding their work on her truck in March 2019, and Gammon's further insistence that fleas only bit certain people, e.g. the John Doe 1-20 mechanics, and not Plaintiff Reavis).

149. At all pertinent times the John Doe 1-20 Defendants were agents, employees, and/or mechanics and journeymen who worked on Reavis' Freightliner were working within the scope of their employment, independent contract, or agency for Defendants Gammon and DE&E.

150. All of these defendants owed contractual, common law and statutory duties of care, along with these Defendants' agents, employees, and/or servants to perform maintenance and repair work on the Plaintiff's vehicle in good faith with a careful, skillful, and workmanlike manner befitting DE&E's Facebook advertising and in particular the sign on their front door which falsely warrantied (and to the best of Plaintiffs' knowledge, still advertises) ALL MECHANICS ARE **ASE** CERTIFIED!

## DIRECT, CONSEQUENTIAL & SPECIAL DAMAGES

151. For her rear end differential (metal pieces in the oil, leaking pinion gear), Reavis originally had brought her 2004 Freightliner to the DE&E Defendants in August 2018, the reasonable cost should not have exceeded around $6,000.00 max to fix.

152. But as a direct result from DE&E's abusive and unprofessional misconduct, Reavis suffered direct, consequential, and special damages, including loss of work, income, professional reputation, emotional tranquility and peace of mind in an amount in excess of $350,000.00.

153. DE&E willfully, knowingly, and in bad faith damaged Reavis truck forever, constituting not merely a breach but also conversion of her property.

154.   Reavis had to borrow money and maxed out two credit cards and her Caterpillar Truck Commercial Account to pay for the additional damages caused by the Gammons, DE&E, and the John Doe 1-20 Defendants.

155.   Reavis still owes approximately over $20,000.00 on which she continues to pay interest though the present date.

156.   DE&E and the Gammons have interfered with Reavis' business, professional, and personal life as well as threatening her life and placing her grandparents' lives in unreasonable danger.

157.   In addition to all of the foregoing, DE&E placed Reavis in danger of poisoning from improperly routed and insufficiently ventilated exhaust coming into the driver cabin of her Freightliner as well as accidents.

158.   Reavis has suffered these damages as the direct and proximate and therefore legal result of DE&E, Gammons', and John Doe 1-20 Defendants' bad faith breach of contract involving careless, negligent, grossly negligent, reckless and or even possibly intention conduct of the Defendants who failed

> (a)   to perform maintenance work and/or make repairs to her vehicle in a careful, skillful, and workmanlike manner;
>
> (b)   to inspect Reavis' Freightliner prior to returning it to her so as to ensure that the maintenance and/or repairs (including replacement parts) were performed, completed, and/or installed carefully, skillfully, and/or in a workmanlike (professional, ASE Certifiable) manner, and

      (c)   to ensure that Reavis' Freightliner was safe for the obviously intended use of heavy haul, long-term interstate and possibly international travel.

159. Reavis engaged in no contributory negligence except continuing to return to DE&E after a firm demonstration of the Gammons and DE&E Defendants' ineptitude, including that of John Does 1-20.

160. Reavis neither caused nor contributed to or aggravated any of the losses or damages she suffered by her own actions or any failure or omission to act on her part, except again by selecting DE&E in the first place and continuing to rely on them to provide a satisfactory and safe work product for eight months.

161. As Carter Machinery in Lynchburg and Westlie Truck Center in Dickinson, North Dakota confirmed and repeatedly reiterated, the sole and proximate cause of Plaintiff Reavis' problems was the carelessness, negligence, gross negligence, recklessness and/or intentional conduct of the DE&E Defendants and/or their agents, employees, and/or servants including but not limited to the Gammons and John Does 1-20.

162. Bad Faith, reckless, intentional, outrageous, negligent or grossly negligent tortious conduct, including willful and wanton destruction constituting conversion are be inferred from the single occasion of DE& E

employees laughing at their own work on Reavis' Freightliner at or near the end of eight months of repeated episodes of "repair."

163. As a direct and proximate result of Defendants' carelessness, negligence, gross negligence, recklessness or even intentionally poor work, Plaintiff Jessica Lynne Reavis sustained severe financial losses plus emotional distress from their extreme and outrageous laughter at their own (unprofessional and obviously incompetent) efforts to repair Reavis transmission over one three or four hour period, as described above.

164. Plaintiffs O'Neil & Reavis ask this Court to take judicial notice and find that, while it took several visits to Carter Machinery Company, but after one final episode and stop at Westlie Truck Center in Dickinson, North Dakota, Reavis has had no significant problems with her truck, despite putting several additional thousands of miles on it every week she works.

165. **WHEREFORE AND ACCORDINGLY**, for the destructive bad faith breach of contract involving negligence, gross negligence, carelessness, and reckless conduct and/or intentionally tortious destruction and conversion committed by DE&E, by and under the supervision of the Gammons and their employees, Plaintiff Jessica Lynne Reavis claims $350,000.00 in actual, consequential, and special damages.

**COUNT VI:**
**VIRGINIA CONSUMER PROTECTION ACT (CONSTITUTIONAL)**

166. Plaintiffs incorporate all the material allegations of their Complaint, stated in ¶¶1-165 above, as if fully recopied and restated herein below.

167. DE&E never provided any accurate estimate for any work they did.

168. Not one estimate was ever accurate or came anywhere close to describing the work necessary to make Plaintiff Reavis' vehicle DOT or otherwise compliant with federal regulations.

**Preliminary Constitutional Question**

169. Plaintiff Jessica Lynne Reavis is admittedly an individual and sole owner/operator of an unincorporated, single-employee business. She pays her taxes in her own name, and not through any corporate or other entity.

170. Again, the DE&E Defendants, in their Memorandum in support of Demurrer, filed October 22 (Exhibit C), raise a defense which this court should find and declare unconstitutional as violative of both equal protection and due process of law.

171. The Virginia Consumer Protection Act specifically aims to protect individuals as consumers against businesses.

172. The rational purpose is to protect individuals from unfair and deceptive trade practices:

> The Virginia General Assembly intended that the VCPA "be applied as remedial legislation to promote fair and ethical standards of dealings between *suppliers* and the *consuming public*." Va. Code § 59.1–197 (emphasis added). As such, only consumer transactions qualify for coverage under the VCPA. Va. Code § 59.1–200.
>
> ***Baker v. Elam***, 883 F.Supp.2d 576 @578 (E.D. Va. 2012).

173. The repair of Reavis' truck was not for sale, nor was it part of a commercial shipping fleet of freightliners.

174. Rather, Reavis' truck was for her individual and personal use, in her very personal and individual business in which no one else shared.

175. There is no legally principled or morally valid distinction between the mechanical repair contracted and paid for by a single individual driving a passenger car along the highway and the mechanical repair contracted and paid for by a single individual personally driving her own 18-wheeler freight truck along the highway.

176. There is no difference, that is, EXCEPT FOR THE VASTLY GREATER RISK POSED BY FAULTY REPAIRS OF A VEHICLE WEIGHING UP TO 80,000 POUNDS GROSS VEHICLE WEIGHT (GVW) TO THE GENERAL PUBLIC BY DEFECTIVE WORKMAMSHIP ON SUCH CRITICAL STRATEGIC INSTRUMENTALITIES OF INTERSTATE COMMERCE---

which despite their weight and size, belong to and are managed by only one sole and solitary individual.

177. **Elam (supra)** concerned the business-to-business storage of 550 canine semen samples sale.

178. Whereas Plaintiff Baker, in that case, could not be considered a member of the consuming public because he was a supplier of dog sperm (**Elam** @579) to satisfy the sexual and reproductive needs of the general breeding public, Plaintiff Reavis is in every sense a personal consumer of vehicle repair services on an individual, not a commercial, "fleet-wide" basis.

179. Reavis is her Freightliner's only driver; her vehicle doubles as her own personal temporary household, her own personal and private campsite or sometimes personal interstate highway resting place and individual motel.

180. In short, Plaintiff's Freightliner could not possibly be more personal.

181. WHEREFORE AND ACCORDINGLY, the narrow and counterproductive construction of the Virginia Consumer Protection Act presented on page 7 of DE&E's Memorandum in support of Demurrer must be declared unconstitutional as both void for vagueness and as a denial of equal protection and just a plainly without rational basis and absolutely contrary to the public interest.

**Count VII:**
**VIRGINIA CONSUMER PROTECTION ACT (APPLIED)**
**DE&E VIOLATED EVERY LETTER AND SPIRIT OF THE VCPA**
**AGAINST JESSICA LYNNE REAVIS AS AN INDIVIDUAL**
**CONSUMER IN THE OPERATION OF A SINGLE-DRIVER**
**VEHICLE**

182.  Plaintiff Jessica Lynne Reavis, as noted, personally operates a solo commercial truck drive and have been in this very personal business most of her life; accordingly, Reavis possesses substantial personal and individual expertise arising from this experience in automotive and specifically Freightliner truck mechanics and operation.

183.  The DE&E Defendants, including the Gammons and John Does 1-20, are in the business of performing maintenance and repair services on specialized commercial vehicles including interstate trucks such as my own, Plaintiff Reavis', 2004 Freightliner Columbia.

184.  Defendants DE&E and the Gammons (including John Does 1-20) offer a commercial truck service, maintenance, and repair facility who for profit diagnose, maintain, and or repair commercial trucks which are damaged or not operating correctly, malfunctioning, etc.

185.  As shown by the extensive receipts attached in Exhibit D, Defendant DE&E provided multiple written invoices upon completion of maintenance and repair work representing that the maintenance and repair work was

COMPLETE, was of proper workmanship and reasonable fitness and was performed according to the highest industry standards and competencies, reflected by their claim of ASE certification.

186. **ASE ("Automotive Service Excellence") certification** exists to improve and maintain the quality of vehicle repair and service.

187. **ASE** sets the bar for the entire industry and keeps individual technicians accountable to a set of standards.

188. **Unlike, and distinct from the Federal Motor Carrier Safety Administration, ASE** is not a regulatory body but it does vouch for reputation, specialty and quality within the automotive industry.   See especially: https://www.ase.com/Home.aspx.

189. On or about April 26, 2019, when Plaintiff Reavis, was getting disgusted with how things had been going at DE&E, Reavis asked for the mechanic's statement on the particular employee who was working on her 2004 Freightliner Columbia and discovered he was not an even an employee there at DE&E but instead was a vocational trade school student from VOTECH in Chatham, Virginia; Reavis would never have trusted a student with my truck.

190. This student "journeyman" mechanic (John Doe #1) attempted to excuse his poor quality of workmanship by informing Plaintiff Jessica Lynne

Reavis, that the fleas in her truck bit him on the arm, but then another employee (John Doe #2) said the fees bit him on the neck. They were obviously lying. Reavis asked for medical proof, a doctor? There was none.

191. Paul Gammon, the owner/manager in charge of DE&E, explained to Reavis that fleas only attack some people and this is why the fleas did not attack the first mechanics that worked on Reavis' truck the entire month of April that it was sitting there (without any reports of fleas). But this was all a source of delay and a major waste of time; Reavis was losing money ever day the truck was in the shop---this was her life and personal livelihood, but she was still a helpless consumer faced with massive repair bills.

192. This was the second episode of intentional lying and unprofessional misconduct which, because it was obviously false, extreme and outrageous, totally unprofessional conduct, caused the Plaintiff extreme concern.

193. On this same day and occasion, Reavis observed the cold welds on the driveshaft which she could see with her own naked non-ASE certified eyes.

194. Reavis asked Gammon and some of the DE&E John Does 1-20 Defendants to do the welds against because she was worried about Plaintiff's driveshaft being "out of phase."

195. On this occasion, DE&E owner/manager Paul Gammon argued with Reavis and said it was what a "spot weld" was supposed to look like.

196. Reavis countered, asserting to Gammon that she had gone to school, graduated at the top of her class in auto mechanics, and also worked at several shops welding, and told Gammon he was wrong.

197. John Doe #3 then agreed he would fix it, but a few days later, at Carter Machinery in Lynchburg, Virginia, they found and reported to Reavis that the driveshaft was in fact still out of phase.

198. After Reavis had failed her DOT inspection on February 5, 2019, after three visits to DE&E, Reavis' new company's shop, CFI, had found Plaintiff's truck's rear end leaking (after this being invoiced on September 18-19, 2018), DE&E admitted that this problem was covered by warranty, and agreed to fix it, but they did not compensate Plaintiff Reavis for her lost time or travel or business opportunities, for which Reavis here demands compensation for special damages.

199. On February 28, 2019, DE&E admitted that they had damaged the aluminum tire rim (these are the steering wheels on the front of the truck) when they replaced the tires which they had installed on 5 February 2019, and gave Reavis a $350.00 credit.

200. They also admitted on February 28, 2019, they would do a "warranty repair" repair on the steering wheel because they (DE&E Employees and John Doe Employees/Agents ##1-10) had ripped the wires out from inside

the steering column when they forcibly removed the steering wheel while trying to "straighten up" the steering wheel.

201.  Accordingly, on March 26, 2019, DE&E replaced the clutch, replaced the seal on the back of the motor, the flywheel, repaired the horn button, and replaced seals in transmission.

202.  Still, on April 22-23, 2019, Reavis could hear several different noises, especially a loud clanking noise.  Upon inspection:

      (a)    the horn button was incorrectly installed.

      (b)    the dust shield damaged and not attached.

      (c)    The dust shield was free spinning on driveshaft.

      (d)    The shifter boot has bolts not installed correctly (just sitting in the hole).

      (e)    There were holes with broken off bolts.

      (f)    There were holes with no bolts.

      (g)    There were new additional holes added to the floor instead of drilling out the broken bolts.

      (h)    Plaintiff could see the transmission from the driver's seat.

      (i)    Plaintiff Reavis could reach through the floor and touch bell housing of the transmission.

203.  After repeated visits in late April, it was about this time that the John Doe 1-20 Defendants reported on behalf of DE&E and Gammon that nobody

wanted to work on the truck because there were "bugs" (or "fleas") in it---see Gammon's comment above.

204. And as also described above, when Reavis took her Freightliner Columbia to Carter Machinery after May 1, 2020, every one of the above-stated problems had remained completely unaddressed and unresolved.

205. Thus, in plain and obvious violation of the Virginia Consumer Protection Act and the Automobile Repair Facilities Act, the DE&E Defendants misrepresented that accuracy of their estimates for work, returning parts removed from the vehicle to Reavis, providing an accurate written invoice upon completion of the work.

206. Furthermore, the Gammons, DE&E, and Defendants John Does 1-20 falsely represented that the repairs, modifications, or services on Reavis' 2004 Freightliner Columbia were of proper workmanship and were performed according to the prevailing industry standards and competences exemplified by the claim of "Automotive Service Excellence" (ASE) Certification.

207. As a direct and proximate result of the DE&E Defendants' carelessness, negligence, gross negligence, recklessness, and intentional or wilful misconduct,  and their resulting violation or multiple violations of the Virginia Consumer Protection Act and/or the Automobile Repair Facilities

Act, Plaintiff Reavis has sustained severe injuries to her individual, household, personal income and individual, professional reputation for competence and timeliness, as well as extreme emotional distress and outrageous interference with her contractual obligations as an essential service provider (Reavis' services were just as "essential" before COVID-19 as they are now, but the Department of Homeland Security did not start issuing statements or certificates about that fact until this year.)

208. As a direct result, Reavis incurred all the expenses reflected in the invoices shown as Exhibits D, E, F, and G and all related expenses and losses, in the minimum amount of $350,000.00.

209. For approximately 4 out of the eight months during which Reavis was dealing with DE&E (September, February, March, and April), because of the tortious conduct of the defendants, Reavis was completely out of work, and during the remaining months she was operating defective and dangerous equipment.

210. After May 1, 2019, further repairs after leaving DE&E required another three months before Reavis could get back on the road and working after the disaster that DE&E had inflicted upon her.

211. Plaintiff Reavis still has not recovered and cannot recover financially because she had to borrow and obligate herself to monthly payments which

originally amounted to $1,400.00 extra per month, in order to cover her debts incurred because of the defendants tortious actions. With COVID-19 relief, this is now down to $1,050.00/month, but interest is accruing, and Plaintiffs move and request that DE&E and the Gammons should reimburse her 100% of her actual out of pocket and diminished income losses.

212. WILLFUL VIOLATIONS: As Plaintiffs have alleged above, the conduct of the DE&E Defendants was extreme, outrageous, and unprofessional; including their falsely claiming that only ASE Certified Mechanics worked on vehicles.

213. However, in addition, the DE&E Defendants also acted knowingly:

    (a)    lying about "fleas" or "bugs" being a barrier to working on Plaintiff's truck (DE&E's uncertified mechanic, from VOTECH, a high school, falsely claimed to have been hospitalized, but obviously could produce no proof when Reavis requested);

    (b)    lying about obvious failures to complete welding in a professional manner and falsely stating that leaving loose bolts was "standard procedure" in the trade; and

    (c)    laughing boastfully and maliciously about how they (DE&E Defendants John Does ##1-10) had to beat (so viciously as to break) Plaintiff Reavis' transmission to mount it.

214. None of these acts can be so depreciated as to amount to mere negligence, but in fact constitute intentional and willfully misleading misconduct.

215. The failure to complete jobs after multiple promises and opportunities to repair should be sufficient to draw a reasonable inference that all the misconduct in this case was in fact willful and malicious.

216. WHEREFORE, Plaintiff Jessica Lynne Reavis prays for all her actual direct, consequential, and special damages in the amount of $350,000.00, plus trebled punitive or exemplary damages as allowed by law.

## COUNT VIII: COMMON LAW FRAUD

217. Plaintiffs incorporate all the material and factual allegations of their Complaint, stated in ¶¶1-216 above, especially emphasizing, but not limited to those concerning DE&E's willful conduct, as if fully recopied and restated herein below.

218. As of May 1, 2019, Defendant claimed that it had performed complete and comprehensive repairs on Reavis' truck which made it safe to drive on the open highways and for work.

219. Doc, the foreman, said that DE&E installed the retaining nut that holds the driveshaft to the pinion gear. This was false, and ultimately led to the

driveshaft coming loose and putting Plaintiff Reavis, her grandparents, and others on the highway in grave danger.

220. When Reavis first took her Columbia Freightliner in to DE&E, she had a very nice chrome steering wheel.

221. Doc, again, said that DE&E had properly repaired the steering wheel horn-button, but instead they had installed a car horn button to the steering wheel cover, instead of properly fixing it in the steering wheel.

222. DE&E, Paul Gammon, and their John Doe employees, attempted to conceal the fact that they broke and did not re-cover the wires out of the steering column, so they improperly installed a used (not new) steering column which did not function properly at all.

223. They claimed in August of 2018, that they had properly the front differential on the rear, for which Reavis paid $6,000.00 (on her way to a total of significantly more than $27,000.00).

224. On 9-18-2018, because the new rear end was leaking, DE&E installed a new differential, but falsely claimed proper installation of the new seals which are essential to the functioning of the differential because these seals (including the pinion seal) prevent the leakage of the oil.

225. This improper installation of these seals was the concealed defect which in fact caused the spillage of oil onto the highways on May 1, 2019,

could have caused a major accident on the road, and ultimately would have caused all new components, and the truck itself, to fail, and catch on fire, and cause multiple collisions and wreckages.

226. On February 5, 2019, the rear end was still leaking after installation of a new differential; in other words DE&E committed common law fraud by claiming to have repaired this key functional feature of the 2004 Freightliner rear end when in fact they had not.

227. On this day they also destroyed the steering column, needlessly ripping the wires out of the steering column, broke the tabs in the horn button so that it was inoperable, in violation of DOT regulations, and scratched the brand-new steer tire rim.

228. They had lied twice to Reavis already but obviously did for a third time.

229. Plaintiff Reavis' Truck failed DOT inspect on February 28, 2019, because of the rear differential leaking.

230. From March 26, 2019, when she took it back it (after six months already) for clutch replacement and to replace the rear main seal on the back of the motor, this is when they claimed that bugs were delaying their work and then when they claimed that the transmission work was done properly when it was not. The yoke was also frozen in the back of the transmission.

231.   In Carter's writeup after Reavis was done with DE&E in May 2019, they found the rear main seal was still leaking.

232.   Carter Caterpillar Machinery (CAT) replaced it.

233.   But DE&E had lied about almost everything they did or claimed to have done and billed Reavis for it anyhow, resulting in a minimum of $27,000 direct, raw, damages for false billing.

234.   Paul Gammon, DE&E, and the DE&E John Doe Defendants, "Doc" and others, falsely and fraudulently warranted the quality of their workmanship on the steering column, which still does not work properly, despite the fact that Reavis paid for this to be repaired properly.

235.   The bolts are broken.

236.   Where the shifter boot was, they attempted to remove the screws but were unsuccessful.  To conceal their failure, they broke off about ten bolts in the floor and instead of removing and capping (reinstalling) new screws, they drilled additional holes in the floorboard and tried to conceal this and installed an inferior, thin shifter boot.

237.   They claimed to have correctly repaired these and other details, such as the driveshaft dust-shield, both installed incorrectly after selecting the wrong replacement parts, even after repeated repairs, and continued to insist that their faulty repairs were proper.

238. This was when the DE&E Defendants claimed there were bugs preventing their proper work.

239. It was only when Plaintiff Jessica Lynne Reavis took her truck to Carter Caterpillar and then Westlie Truck in North Dakota that she realized the extent of their fraudulent claims to have completed repairs.

240. Plaintiffs allege and submit that the evidence in this case will show by clear and convincing evidence that the Gammons and the other DE&E Defendants (including some of the John Does 1-20) acted with actual intent to defraud Jessica Lynne Reavis by their statements to her, which they knew were false but made with intent to mislead her:

(a)   that they would repair Reavis vehicle under warranty but failed to perform the necessary or contracted for repairs;

(b)   that they posted a sign on their front door reading "All Mechanics are ASE certified" when in fact they allowed students to work on Plaintiff Reavis' freightliner;

(c)   that the presence of bugs and/or fleas in Reavis' vehicle and used this as a pretext for prolonging the work, and Reavis' entrustment of her freightliner, longer than reasonable, causing Reavis' additional direct and consequential damages;

(d)   That Reavis should ignore her own observations of DE&E carelessness, negligence, gross negligence, recklessness and intentional conduct, especially the Defendants' willful acts of sabotage while issuing guarantees and invoices and receipts for work which all or some of the DE&E Defendants knew or should have known had simply not been done.

241. Plainly the history of this case recounted so far shows beyond reasonable doubt, but at least by clear and convincing evidence, that

    (a)   looking back on the circumstances, the DE&E Defendants could not possibly have believed these statements to be true;

    (b)   the DE&E made these statements with intent to mislead Plaintiff Reavis,

    (c)   Plaintiff Reavis obviously believed and trusted in these intentional misrepresentations of fact, and

    (d)   Plaintiff Reavis suffered massive actual, direct, consequential and special damages as a result of EIGHT MONTHS OF REPEATED RELIANCE AND TRUST REPOSED IN THE DE&E DEFENDANTS.

242. Specifically, the Gammons' and DE&E made guarantees regarding warranty-covered work which they never intended to fix, and in fact did not fix, later admitting that Plaintiff Reavis was entitled to warranty repair work. This constituted a series intentional fraudulent misrepresentations and therefore, constituted common law fraud.

243. The DE&E Defendants, Paul Gammon in particular, and other among the Does 1-20 all induced Reavis to accept, believe, and rely on their repeated promises even after months of obvious deception.

244. The intent to induce Reavis to rely on false promises regarding repair of past failures was continuous and ongoing.

245. Specifically, advertising on their front door that "All Mechanics were ASE Certified" while allowing students to work on Reavis' Freightliner Columbia was an intentional misrepresentation and therefore constituted common law fraud in that Reavis had understood the importance of ASE certification throughout her career and relied upon it.

246. Specifically, claiming that bugs or fleas interrupted and delayed the DE&E Defendants' work on Reavis' Freightliner Columbia commercial truck was an intentional misrepresentation thus constituting common law fraud, which Reavis nonetheless relied on in that she continued to trust DE&E with the vehicle upon which Reavis depended for her life and personal "on-the-road mobile-home and residence."

247. Reavis would quite simply NEVER have left the work go unfinished for so long but for repeated claims implicitly blaming her and her dogs (for the slowness of DE&E work, when Sharon Gammon kept five dogs on the premises).

## **PRAYER FOR RELIEF**

248. Wherefore and accordingly, Plaintiffs pray for judgment for all their actual (direct, consequential, and special damages) in the minimum amount of $350,000.00 for Jessica Lynne Reavis against the Gammons, DE&E, and all John Doe Defendants 1-20.

249. Plaintiff Jerry O'Neil prays for declaratory judgment and an injunction against Angela Reece Harris for her acts inhibiting Plaintiff Reavis' ability to communicate with the Court, in which prayer Jessica Lynne Reavis also joins.

250. Plaintiffs pray for damages of $5,000.00 against Angela Reece Harris.

251. Plaintiffs pray that this Court declare and adjudge that Angela Reece Harris is not entitled to a defense paid by the State of Virginia because her actions against Jerry O'Neil were outside the course of her lawful duties.

252. Plaintiffs pray, in particular, that VA Code Ann. §15.2-1606 and all related statutes be declared unconstitutional as a violation of equal protection under the Fourteenth Amendment as well as the prohibitions on titles of nobility in the constitutions of the United States and State of Virginia (U.S. Constitution: Article I, §§9-10)(VA. Declaration of Rights, 1776, §4).

253. Plaintiffs pray for a declaratory judgment and injunctive relief declaring that the Virginia Source of Duty Rule is unconstitutional and enjoining its future enforcement in any court, state or federal.

254. Plaintiffs also and further pray for a declaratory judgment finding that the Virginia Consumer Protection Act applies to self-employed truck drivers who drive their trucks to and from work without pay similar to how self-employed Uber drivers drive their vehicles when not "on the clock".

255. Plaintiffs also and further pray for the recognition and affirmation of "Contractual Torts" aka "ConTorts" in the State of Virginia.

256. Plaintiffs also and further pray for allowing damages for negligent and intentional infliction of emotional distress where grossly negligent breaches of contract threatens life or limb after unprofessional conduct, or even simple breaches of contract, where breaches of duty put one contracting party's family and relatives at risk, or where the breaching party puts the non-breaching party at risk of grotesque accident or serious exposure to liability to third-parties, as for example by the negligent repair of an 18-wheeler truck in such a manner as might cause major oil slicks or other hazards on the public highways.

257. Plaintiffs allege willful and malicious conduct and hence pray for three times the actual damages sustained, as authorized by the second sentence of §59.1-204A of the Consumer Protection Act, and all such other and further relief as this Honorable Court deems just and proper in this manner.

/////////////////////////////////////

/////////////////////

///////////

/////

//

*Jerry O'Neil & Jessica Lynne Reavis, v. Angela Reece Harris,*
*Paul & Sharon Gammon, Diesel Engine & Equipment Repair, et al.*            Page 78

## DEMAND FOR TRIAL-BY-JURY

Plaintiffs demand a trial-by-jury of all issues so triable at common law, by statutes, and under the Constitutions of the United States of America and the Commonwealth of Virginia.

DATED this Monday, the 25th day of January 2021.


_____
Jerry O'Neil, Plaintiff
985 Walsh Road
Columbia Falls, Montana 59912
(406) 250-2503 – phone
Email --- oneil@centurytel.net


_____
Jessica Lynne Reavis, Plaintiff
714 Vicar Road
Danville, Virginia 24540
Telephone: 434-425-9380
E-mail: ltlsmky@live.com